UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| JOE HAND PROMOTIONS, INC.,<br><br>Plaintiff,<br><br>- vs -<br><br>ARHAM & AYDIN INVESTMENT, INC., *et al.*,<br><br>Defendants. | CASE NO.: 4:26-cv-03853 |

**EXHIBIT B(1)**

# COMMERCIAL LICENSING AGREEMENT

This Commercial Licensing Agreement ("Agreement") is made and entered into effective as of May 17, 2023 by and between MVP Management, LLC, with a business address at 1064 Ponce De Leon Ave, Suite 507, San Juan, Puerto Rico 00907(the "Licensor") and JOE HAND PROMOTIONS, INC., a corporation chartered in the Commonwealth of Pennsylvania with its principal place of business located at 213 W. Street Road, Feasterville, Pennsylvania 19053 ("JHP").

## RECITALS

**WHEREAS**, Licensor is the exclusive distributor in the Market Territory (as defined below) of the live audiovisual closed-circuit broadcast of ***Jake Paul vs. Nate Diaz*** to be held on August 5, 2023 (hereinafter referred to as the "Event");

**WHEREAS**, JHP is engaged in the business of promoting and distributing commercial closed-circuit events; and

**WHEREAS**, Licensor desires to show its Event via theatrical distribution, closed circuit television, including cable, satellite and internet streaming, at commercial locations and JHP desires to promote and distribute the Event via theatrical distribution, closed circuit television and streaming at commercial locations in continental United States, Alaska, and Hawaii, and U.S. territories and possessions, Puerto Rico and Canada (the "Market Territory").

**NOW THEREFORE**, in consideration of the above RECITALS which are incorporated into the terms and conditions hereinbelow, and for other valuable consideration and intending to be legally bound hereby, Licensor and JHP agree as follows:

## APPOINTMENT AND NATURE OF JHP

1. ***Appointment of JHP.*** Subject to the terms and conditions set forth in this Agreement, Licensor hereby grants JHP the sole and exclusive third party license during the Term (defined below) to distribute, via cable, satellite and/or Internet stream, and authorize the public exhibition of the Event through the Distribution Channel (defined below) in the Market Territory, and JHP agrees fully and faithfully to perform and discharge the duties, obligations, and responsibilities provided for in this Agreement. Licensor represents that it has no other such agreements with any other distributor for the Event in the Market Territory for the Distribution Channel. Permitting distribution of the Event for the Distribution Channel by any other entity in the Market Territory by another distributor shall be considered a breach of this Agreement.

1.1. Any and all rights to the Event or any elements thereof not specifically licensed to JHP under the Agreement are expressly reserved to Licensor, including without limitation, territories not licensed herein, all series' format rights, all other forms of distribution not licensed herein, residential distribution, non-Event programming, highlights, clips, videocassette, home video, digital video disk (DVD) and via mobile devices (i.e. through an open platform made available publicly), print, merchandising, or by any other similar or dissimilar means in any media or distribution paths now known or hereafter devised, except as expressly set forth herein. Such reserved rights may be freely exploited by any non-television or television distribution technology at any time throughout the world by Licensor. Nothing herein shall limit, constrain or prevent Licensor from exploiting all rights to the Programs in the Market Territory on

its owned, operated and controlled platforms, including without limitation, its Internet and mobile platforms, widgets and applications.

2. ***Distribution Channel.*** JHP shall be the sole and exclusive third party distributor of commercial closed circuit television, commercial movie theater exhibition or commercial streaming of the Event in the Market Territory, and may only distribute the Event in the Market Territory through movie theater exhibition, closed circuit television, IPTV or, solely as authorized by Licensor in writing, via the Internet utilizing a streaming application, in each case authorizing the public display by commercial establishments only (the "Distribution Channel"). Additionally, nothing herein shall in anyway limit or restrict Licensor's absolute rights to show the Event to residences, hotel rooms, dormitories, military base residential living, and all similar locations, via any and all means and modes of pay-per-view television, Internet, wireless, broadband, and all other means or modes now known or hereafter developed.

3. ***Authority and Capacity.*** Each Party hereto is an independent contractor, is not an agent of the other Party, and so neither are authorized to waive any right or to incur, assume or create any debt, obligation contract or release of any kind in the name of or on behalf of the other Party. Nothing herein shall be construed so as to create an employer-employee, agency, partnership, or joint venture relationship between the Parties hereto.

4. ***Term.*** This Agreement shall become effective upon execution by JHP and Licensor and shall continue in effect until all applicable payments have been made following the Event (the "Term").

**JHP OBLIGATIONS**

5. ***Best Efforts to Market.*** JHP shall exercise its best efforts to advertise, promote and market the Event and to promote the goodwill of Licensor and the market reputation of the Event. JHP shall conduct its activities related to the marketing of the Event in a professional manner and in accordance with the reasonable policies and procedures of Licensor and the terms of this Agreement. Marketing expenses to be deducted from the Net License Fee shall be subject to the prior written approval of Licensor.

6. ***Advertising.*** JHP shall advertise the Event in a manner that will develop customer interest and confidence in Licensor and in the Event. JHP shall be entitled, during the term of this distributorship created by this Agreement to advertise and hold itself out as an authorized distributor of the Event through the Distribution Channel. JHP shall submit examples of all proposed advertisements and other promotional materials of the Event to Licensor for inspection and JHP shall not use any such advertisements or promotional materials without having received the prior written consent of Licensor to do so. JHP shall not, pursuant to this Agreement or otherwise, have or acquire any right, title or interest in or to Licensor's Trademarks. Advertising expenses to be deducted from the Net License Fee shall be subject to the prior written approval of Licensor.

**6.1** JHP shall prepare all documentation necessary to meet the legal requirements of distribution via the Distribution Channel, including but not limited to: (i) preparation of licenses and technical documentation for each location, (ii) distribution of marketing and promotional materials, and (iii) collection of all funds and preparation of sales and revenue reports in a timely fashion.

**6.2** JHP shall provide direct marketing, such as mailing pieces and other forms of advertising to create awareness of the program. Such direct marketing shall comply with all Federal, State and local laws.

**6.3** Licensor will support the commercial distribution campaign by dedicating a portion of their marketing budgets in an amount reasonably determined by Licensor specifically for commercial promotion. Additionally, Licensor will use good faith efforts to promote JHP's bar finder application and the appropriate national chain partners through their digital platforms (i.e., Facebook, Twitter, Instagram, etc.). With written approval by Licensor, JHP may engage one or more regional closed-circuit distributors to assist JHP with JHP's exercise or performance of JHP's rights and/or obligations under this Agreement (each, a "**Vendor**") it being understood that if JHP engages a Vendor to provide services and/or other resources to enable JHP's exercise or performance of JHP's rights and/or obligations under this Agreement, then (a) JHP shall be liable for any act (or omission) its Vendor which if taken (or not taken) by JHP would constitute a breach of this Agreement, and (b) subject to Section 13 of this Agreement, JHP may only disclose confidential information to a Vendor to the extent necessary to allow the Vendor to perform its services assisting JHP, but no confidential information shall be disclosed to any such Vendor unless such Vendor is bound by written non-disclosure obligations at least as protective of confidential information as the confidentiality provisions of this Agreement. Licensor shall not be subject to any double commissions and JHP agrees to be solely responsible for any and all commissions, fees and other amounts that may be due to any Vendors.

**6.4** JHP shall indemnify, defend and hold Licensor, its officers, directors, members, employees and agents harmless from and against all claims of other regional closed-circuit distributors for commissions, fees, or other amounts claimed to be due in connection with distribution of the Event arising under this Agreement and relating to the Event.

**7.** ***Security.*** Upon written demand, JHP shall provide Licensor with a complete list of verifiable customers. JHP shall use reasonable best efforts to discourage theft of service and the unauthorized exhibition of the Event at commercial locations. In an effort to protect the commercial closed-circuit broadcast rights, JHP will coordinate and finance its own piracy program. JHP shall have the right as exclusive licensee in the Market Territory to assert independent claims, including under the Communications and/or Copyright Acts, against commercial infringers that receive and exhibit the Event without authorization. Net monetary recovery after all costs and fees through piracy settlements or judgments [redacted] Licensor agrees that as exclusive commercial Licensee in the Market Territory, JHP may assert claims and file lawsuits in its own name under the Communications and Copyright Acts against unauthorized non-residential/commercial establishments that obtain the Event through cable, satellite, or internet.

**8.** ***Consumer Data.*** To the extent permitted by law, JHP agrees to collect and report to Licensor data in respect of location/establishment data, including location, address, contact person, price and purchase history for the Event, as well as non-personally identifiable consumer information, including buying habits, usage behavior and economic data, as applicable ("Consumer Data") with respect to JHP's distribution of the Event. JHP acknowledges that such Consumer Data constitutes Confidential Information for purposes of the License Agreement and does not disclose such Consumer Data to any third parties. JHP represents, warrants and covenants that it does and will comply with all applicable privacy and information security laws and regulations applicable to such Consumer Data.

## LICENSOR OBLIGATIONS

**9.** Licensor hereby grants JHP permission to enter into agreements with DirecTV, Dish Network, other DBS satellite providers, individual cable system operators, and Internet Protocol television (IPTV) providers which shall act as authorization sources for their commercial customers utilizing that technology to broadcast the Event. If necessary, JHP shall ask Licensor and Licensor shall cooperate to assist in its negotiations with these digital authorization sources in order to reach an agreement on terms for authorizing the requested commercial account. JHP shall use its best efforts to obtain the most favorable terms and fees from all such providers. JHP agrees that any new media platforms must be approved by Licensor, in its sole and absolute discretion.

## FINANCIALS

**10.** As compensation for these exclusive rights, JHP shall pay Licensor the following with respect to the Event:

[redacted]

**10.2** Net License Fees are defined as gross license fees (not including the carrier authorization fee), less actual credit card fees (capped at 3%), less actual marketing and advertising expenses (approved in advance in writing by Licensor), and any miscellaneous Event license taxes.

**10.3** JHP shall pay Licensor's share of the Net License Fees sixteen (16) days after the live broadcast of the Event. JHP shall deliver to Licensor a full report containing the usual and customary information regarding the source and calculation of Net License Fees.

**10.4** JHP may withhold from Licensor's up to one percent (1%) of Net License Fees as a bad debt fund, with any surplus amount to be remitted to Licensor for such calendar year on or before one hundred and twenty (120) days following the Event. JHP will provide a list with location, Event and bad debt amount withheld and shall promptly pay Licensor upon receipt of payment for such bad debt, if any.

**10.5** The Suggested Retail Price shall be determined by Licensor, in its sole discretion, after consultation with JHP. The actual retail price of distribution shall be determined by JHP in its sole discretion.

**10.6** Unless Licensor instructs JHP in writing otherwise, all payments to be made by JHP to Licensor shall be made by wire transfer to Licensor in accordance with the following instructions:

[redacted]

**INTELLECTUAL PROPERTY AND INDEMNIFICATION**

**11.** ***Proprietary Rights.*** Licensor agrees that JHP holds the right to authorize the exhibition of the Event publicly within the meaning of 17 U.S.C. § 106(4)-(5). All other intellectual property including patents and patent applications, trademarks, servicemarks, copyrights, tradenames and other proprietary rights in and with respect to the Event and Promotional Materials are and will remain exclusively the property of Licensor. During the term of this Agreement, JHP may indicate that it is an authorized distributor of the Event for Licensor and may within the direction of Licensor use the trademarks, servicemarks, logos, symbols and tradenames of Licensor applicable to the Event in connection with JHP's advertising, promotion, distribution and sale of the Event in the Market Territory in accordance with the terms of this Agreement;

**11.1** JHP shall neither acquire nor assert any intellectual property right, title or interest in or directly or indirectly obtain or attempt to obtain at any time any right, title or interest by registration or otherwise in or to the tradenames, trademarks, symbols or designations owned or used by Licensor. Any and all work by JHP pertaining in any way to this Agreement is expressly deemed and agreed to be work-for-hire and all rights belong to Licensor. JHP agrees that any and work by JHP and all intellectual property, including without limitation, concepts, ideas, copy, graphics, compilations, sketches, artwork, electronic files, video, film, photography, photograph layouts, any and all derivative works, and other materials related to the Event and will become the sole and exclusive property of Licensor throughout the world in perpetuity. Licensor may use any and all materials generated as it sees fit without any additional compensation; however, Licensor is not under any obligation to use such materials. To the extent that any of the materials may not, by operation of law or otherwise, be a work made for hire in accordance with the terms of this Agreement, JHP hereby irrevocably assigns and transfers to Licensor all right, title and interest in and to any registrations and copyrights, and Licensor shall have the right to obtain and hold in its own name any copyrights, registrations and other proprietary rights which may be available. All reproduction rights are retained by Licensor and any and all work by JHP may not be reproduced in any form without written consent from Licensor. JHP hereby assigns to Licensor all JHP's worldwide right, title and interest in Licensor's trademarks, servicemarks, logos, symbols and tradenames, and in any derivation, adaptation, variation or name thereof. Without limiting the foregoing, JHP hereby assigns to Licensor all JHP's worldwide right, title and interest in any material objects consisting of or incorporating any drawings, paintings, or other derivations, adaptations, compilations, collective works, variations or names relating to Event or the Licensor;

**11.2** Whenever JHP is permitted to employ any trademark or servicemark of Licensor in any form on printed materials, JHP shall place immediately after and slightly above the use of the trademark, "®" or "TM" and indicate that it is the trademark or registered trademark of Licensor.

**12.** ***Third Party Infringement.*** JHP agrees to actively monitor and give Licensor prompt written notice of any unlicensed use by third parties of the Licensor's intellectual proprietary rights including trademarks and tradenames. JHP shall immediately notify Licensor upon discovery of any theft, piracy or any unauthorized exhibition, distribution, alteration, copying or duplication of the Event or any other Licensor content or programming. JHP will not, without Licensor's written consent, bring or cause to be brought any criminal prosecution, lawsuit, or administrative action for infringement, interference with or violation of any rights to trademarks or tradenames. JHP agrees to cooperate with Licensor, and, if necessary, to be named by Licensor as a sole complainant or co-complainant in any action against an infringer of the Event and Licensor's trademarks or tradenames.

**13.** ***Mutual Confidentiality.*** The Parties agree to keep the terms and conditions of this Agreement confidential, and shall not disclose such terms and conditions to any third party without obtaining the other Party's prior written consent; provided however, that this Agreement may be disclosed on a need-to-know basis to Party attorneys and accountants who agree to be bound by this confidentiality provision or by Court order or by subpoena. The Parties may disclose information of a financial nature in this Agreement to their auditors and to financial institutions in the ordinary course of business. In addition, the Parties may have access to information concerning the other Party's business and operations, and/or other matters relating to the other Party's creations or business plans, which information may not be accessible or known to the general public. The Parties agree to keep any and all such information strictly confidential and not to use or disclose such information to any third party without obtaining the other Party's prior written consent.

**INDEMNIFICATION**

**14.** Licensor shall indemnify, defend and hold JHP, its officers, directors, employees and agents including such individuals or entities contemplated under Section 6.4 above (the "Indemnitees") harmless from and against all third party claims, demands, suits, judgments, losses, liabilities (including settlements entered into in good faith with Licensor 's consent, not to be unreasonably withheld) and expenses of any nature (including reasonable attorneys' fees) that any Event infringes any patent, trademark, servicemark, tradename or other intellectual property rights in the Market Territory (other than music performance licenses). Licensor shall also indemnify, defend and hold JHP harmless for any claim, fine or penalty that may arise out of or involve the content of any Licensor event, including but not limited to charges of obscenity or profanity or any of the violation of FCC rules or regulations that may apply. Licensor shall assume the defense of any suit based on any such claim of infringement brought against JHP specifically relating to the Event by retaining at Licensor's expense counsel to represent JHP. Licensor shall pay any damages assessed against or otherwise payable by JHP as a result of the final disposition of any such suit relating to the Event.

**15.** Licensor's indemnity hereunder is conditioned upon: (a) Licensor's prompt receipt of written notice of any such claim or of the commencement of any such suit, or threats thereof after JHP has received notice of same; (b) Licensor having full opportunity to conduct the defense thereof; and, (c) the cooperation of the Indemnitees in the defense of such claim. JHP shall not incur any defense costs without Licensor's prior written consent.

**16.** JHP shall indemnify, defend and hold Licensor, its affiliates, members, parents, successors, officers, directors, employees and agents, harmless during and after the term hereof against all claims, demands, suits, judgments, losses, liabilities (including settlements entered into in good faith with JHP's consent, not to be unreasonably withheld) and expenses of

any nature (including reasonable attorneys' fees) arising out of JHP's activities under this Agreement, including but not limited to, any actual or alleged: (a) negligent acts or omissions on JHP's part; (b) personal injury; (c) infringement of any rights, other than intellectual property rights of the Event, of any other person by the manufacture, sale, possession or use of the Event; (d) breach on JHP's part of any covenant, representation or warranty contained in the Agreement; (e) claims, litigation and publicity as a result of claims made against commercial locations on behalf of JHP, include letters of demand, and litigation, or, (f) failure of JHP to comply with applicable Laws, including but not limited to, violations of antitrust laws. JHP shall pay any damages assessed against or otherwise payable by Licensor as a result of the final disposition of any such suit.

**17.** JHP's indemnity of Licensor hereunder is conditioned upon: (a) Licensor giving prompt written notice to JHP of any such claim or commencement of any such suit, or threats thereof after Licensor has received notice of same; (b) JHP having full opportunity to conduct the defense thereof; and, (c) the cooperation of Licensor in the defense of such claim. Licensor shall not incur any defense costs without JHP's prior written consent.

**18.** To be clear, the limitations under Sections 15 and 17 above shall apply only if the indemnitee Party has provided late notice causing the indemnifying Party to suffer material prejudice.

**TERMINATION**

**19.** JHP and Licensor may terminate this Agreement at any time by giving each other at least sixty (60) days written notice of the intention to terminate. No damages or other compensation shall be payable to either party on account of such termination excepting, however, that any revenue then due shall be distributed in accordance with this Agreement. Any event scheduled to take place within sixty (60) days of the notice of termination shall be distributed and broadcast in accordance with this Agreement and all revenues generated thereby shall be paid pursuant to this Agreement.

**20.** Licensor may terminate this Agreement, by giving JHP at least thirty (30) days written notice of the intention to terminate, in the event of any of the following occurrences:

**20.1** Any act of dishonesty or violation of laws by JHP arising in relation to this Agreement, which could affect JHP's ability to perform hereunder or which, in the sole judgment of Licensor, could be detrimental to Licensor or its business;

**20.2** The unauthorized release to third parties by JHP proprietary, confidential or commercially sensitive information, which refers to or relates to Licensor or the Event;

**20.3** Changes in laws or governmental policies making it impractical for the Event to be produced or for JHP to act as a distributor for the Event;

**20.4** The cessation of business activities by JHP;

(a) The insolvency or admission by JHP of its inability to pay its debts as they mature,

(b) The filing of a petition for bankruptcy or similar proceedings by or against JHP or,

(c) A general assignment for the benefit of JHP's creditors or similar acts;

**20.5** Any material breach by JHP of any term or condition set forth in this Agreement other than those set forth above, provided, however, that for any such breach, JHP shall not have cured such breach after notice has been given to JHP by Licensor.

**21.** ***Effect of Termination or Expiration.*** Upon termination or expiration of the Agreement:

**21.1** JHP shall discontinue the use of any and all Licensor's intellectual property, including, but not limited to tradenames, trademarks, symbols or designations associated with Licensor or the Event and shall immediately discontinue designating itself as an authorized distributor of Licensor.

**21.2** JHP shall immediately return to Licensor all items of proprietary or confidential information delivered to JHP hereunder.

**22.** ***Remedies.*** Neither the right to terminate nor the actual termination of this Agreement upon breach of any provision hereof shall limit either party from pursuing whatever relief it deems appropriate for such breach, in accordance with, and subject to any limitations contained herein.

**23.** ***Regulatory Termination.*** In the event that a Regulatory Problem (as hereinafter defined) arises at any time as a result of this Agreement or the underlying relationship between the Licensor and JHP (or any of their affiliates, members or subsidiaries), Licensor shall take all action deemed reasonably necessary by its officers, members, managers or advisors, including, without limitation, amending or terminating this Agreement, in order to eliminate such Regulatory Problem. For purposes of this Section, "Regulatory Problem" means any circumstances such that Licensor's continued affiliation or contractual relationship with JHP (or any affiliate thereof), is deemed likely, in the reasonable judgment of Licensor, based on a verbal or written inquiry or verifiable information or information received from any gaming or athletic authority, to preclude or materially delay, impede, jeopardize or impair the ability of Licensor or any of its officers, owners, members, managers, employees or affiliates to obtain or retain any gaming or athletic license, or such as may result in the imposition of materially burdensome terms and conditions on any such gaming or athletic license, or such as could subject Licensor or any of its officers, owners, members, managers, employees or affiliates to any disciplinary proceedings by any gaming or athletic authority, or such as would constitute a violation of the gaming or athletic laws.

**FORCE MAJEURE AND COMPLIANCE WITH LAWS**

**24.** ***Force Majeure.*** If either Party is delayed, or interrupted in, or prevented from the performance of its obligations hereunder by reason of an act of God, fire, flood, war, public disaster, strikes or labor difficulties, governmental enactment, regulation or order, or any other cause beyond its control, and if such Party has given the other Party prompt notice hereof and, on request, such confirmatory documentation as the other Party may reasonably request and has in good faith kept the other party apprised of when the delay, interruption or prevention is expected to be resolved, the time for the performance of the party's obligations shall thereupon be extended for a period equal to the duration of the contingency that occasioned the delay, interruption or prevention, but not exceeding sixty (60) days unless otherwise mutually agreed. If

the force majeure condition continues for more than sixty (60) days, either Party may terminate this Agreement upon written notice to the other Party.

**25.** ***Compliance with United States Laws and Regulations.*** It is understood that imports and sales of the Event by JHP may require approvals pursuant to and in compliance with federal and state laws and regulations of the Market Territory. In order to assure that imports and sales of the Event made pursuant to this Agreement do not violate any applicable laws or regulations, the parties agree as follows:

**25.1** JHP shall promptly provide to Licensor information on laws, rules, and regulations of the Territory or of any state or political sub-division thereof insofar as such laws, rules, or regulations affect or are likely to affect (i) JHP's rights to distribute or sell the Event; or (ii) Licensor's rights under this Agreement.

**25.2** JHP shall at all times comply with, and shall require its dealers at all times to comply with, all applicable laws, rules and regulations of the Territory or of any State or political subdivision thereof that affect or impact this Agreement and each party's rights and obligations hereunder or that affect or regulate the manufacture of the Event or their importation into the Market Territory.

**GENERAL PROVISIONS**

**26.** ***Notices.*** All notices or other communications given under this Agreement shall be in writing, shall be sent by email transmission (with a hard copy sent by regular or overnight mail) to the other party, at the address below (with a copy to the attention of its Law Department) (unless either party at any time or times designates another address for itself by notifying the other party thereof by email transmission, in which case all notices to such party thereafter shall be given at its most recently so designated address). Notices shall be sent to the following addresses:

If to Licensor:
MVP Management, LLC
c/o Nakisa Bidarian
Email: nakisa@bavafasports.com

With a copy to rtorres@goodwinlaw.com

If to JHP:
Joe Hand Promotions, Inc.
213 W. Street Road
Feasterville, PA 19053
Attn: Mr. Joe Hand, Jr.
Email: joejr@joehandpromotions.com

With a copy to:
Peter C. Buckley, Esquire
Fox Rothschild, LLP
2000 Market Street, 20th Floor
Philadelphia, PA 19103

Email: PBuckley@FoxRothschild.com

Any notice or other communication given by email transmission shall be deemed received on the day of transmission if a business day, or on the next business day after the day of transmission if not transmitted on a business day.

27. ***Counterpart.*** This Agreement may be executed in counterparts, each shall be deemed an original, but all of which taken together shall constitute but one and the same instrument.

28. ***Governing Law; Forum Selection; Consent to Jurisdiction.*** This Agreement and its incorporated Exhibits have been delivered at and shall be deemed to have been made and entered into in New York, New York. Accordingly, the rights and liabilities of the Parties shall be determined in accordance with the laws of the State of New York, without regard to its principles of conflicts of laws. The Parties agree that the exclusive jurisdiction and venue for the resolution of any dispute arising from or relating to this Agreement shall lie in the state and federal courts located in the city and county of New York. Each party irrevocably consents to the service of process in any such dispute if served in accordance with the notice provisions contained herein.

29. ***Remedies Cumulative.*** Unless otherwise provided for under this Agreement, all rights of termination or cancellation, or other remedies set forth in this Agreement, are cumulative and are not intended to be exclusive of other remedies to which the injured party may be entitled by law or equity in case of any breach or threatened breach by the other party of any provision in this Agreement. Use of one or more remedies shall not bar use of any other remedy for the purpose of enforcing any provision of this Agreement. JHP's sole remedy for breach of this Agreement by Licensor shall be an action for money damages and in no event shall JHP be entitled to injunctive or other equitable relief. However, Licensor may seek equitable relief against JHP under this Agreement, including but not limited to injunctive relief.

30. ***Entire Agreement.*** The terms of this Agreement are intended by the parties as a final expression of their Agreement with respect to such terms as are included in this Agreement and may not be contradicted by evidence of any prior contemporaneous agreement. The parties further intend that this Agreement constitutes the complete and exclusive statement of its terms and that no extrinsic evidence whatsoever may be introduced in any judicial proceeding, if any, involving this Agreement.

31. ***Modification and Amendments.*** This Agreement may not be modified, changed or supplemented, nor may any obligations hereunder be waived or extensions of time for performance be granted, except by mutual agreement and written instrument signed by the Parties.

32. ***Waivers and Extensions.*** No waiver or breach of any Agreement or provision herein contained shall be deemed a waiver of any preceding or succeeding breach thereof or of any other agreement or provision herein contained. No extension of time for performance of any obligations or acts shall be deemed an extension of time for performance of any other obligations or acts.

33. ***Titles and Headings.*** Titles and headings of sections of this Agreement are for convenience of reference only and shall not affect the construction of any provisions of this Agreement.

34. ***Schedules***. Each of the Schedules, if any, referred to herein and attached hereto is an integral part of this Agreement and is incorporated herein by reference.

35. ***Consents and Approvals.*** Whenever consent or approval of either party is provided for in this Agreement, such consent or approval shall be given in writing to the requesting party.

36. ***Further Assurances***. The parties agree to do such further acts and things and to execute and deliver such additional agreements and instruments as the other may reasonably require to consummate, evidence or confirm the agreements contained herein in the manner contemplated hereby.

37. ***Assignments and Sublicenses.*** The services to be provided by JHP hereunder are peculiar and special in nature. Therefore, neither JHP nor Licensor shall assign this Agreement in whole or in part without the prior written consent of the other party. Notwithstanding the foregoing, Licensor may assign this Agreement or any of its rights hereunder, without the other's consent, to any entity with which it may be merged or consolidated or which acquires all or substantially all of its assets, provided that such an entity agrees in writing to assume all applicable obligations under this Agreement. Any purported assignment or transfer by Licensor of any of its rights or obligations under this Agreement other than in accordance with the provisions of this Section shall be void, unless otherwise approved by the parties. JHP agrees it shall maintain a consistent level of integrity, quality and exposure level of the Event during the entire Term of this Agreement to Licensor's satisfaction. This Agreement will bind and inure to the benefit of the respective successors and permitted assigns of JHP or Licensor.

38. ***Partial Validity.*** If any provision of this Agreement is found to be invalid by any court, the invalidity of such provisions shall not affect the validity of the remaining provisions hereof.

39. ***Survivability.*** The respective obligations of the parties under this Agreement, which by their nature would continue beyond the termination, cancellation or expiration of this Agreement, including but not limited to indemnification, audit rights and piracy settlement payments, shall survive termination, cancellation or expiration of this Agreement.

40. ***Audit Rights.*** JHP shall keep full, clear and accurate books of account and records with respect to all financial terms, including and not limited to gross license fees, Net License Fees, authorization fees, credit card fees and any miscellaneous event license taxes pursuant to this Agreement. The books and records shall be maintained in such a manner that the reports required herein shall be readily verifiable. Licensor, and Licensor's designated agent (designated in writing by the Licensor), shall have the right to examine and audit JHP's records at JHP's business premises upon reasonable prior notice to JHP and during normal business hours. Licensor shall be entitled to examine and audit JHP's records once in any calendar year unless a prior audit by Licensor in that year revealed a deficiency. If Licensor's audit reveals an overpayment in any payments due to Licensor pursuant to this Agreement, such amounts will be credited against the payments next due. If Licensor's audit reveals a deficiency in any payment due under this Agreement, JHP shall remit the amount of the deficiency within 10 days after demand therefore together with interest at a rate of seven percent (7%) per annum. If any such audit shows a deficiency of greater than five percent (5%) with respect to the amounts that should have been paid to Licensor, the reasonable cost of such audit shall be paid by JHP. After twelve (12) months from the date of any report and corresponding payment, that report shall be deemed final and binding and Licensor shall have no further right to contest the report or payment of Licensor's revenue share as specified therein. Notwithstanding the foregoing, if JHP disagrees with the results of an audit by Licensor, JHP and the Licensor shall mutually agree

DocuSign Envelope ID: F2F61399-12C9-4ADF-9FAF-4AEB86B3D912

with a duly adopted resolution of the Board of Directors of said corporation, and that this Agreement is binding upon said corporation on accordance with its terms.

**IN WITNESS WHEREOF**, the parties have executed this Agreement effective as of the date first written above.

**MOST VALUABLE PROMOTIONS**

By: DocuSigned by: Nakisa Bidarian 49A3E3E1CB8E4EE... Date: 5/18/2023

Printed Name: Nakisa Bidarian

Title: Member

**JOE HAND PROMOTIONS, INC.**

By: DocuSigned by: Joe Hand Jr 4A69525298634DC... Date: 5/18/2023

Printed Name: Joe Hand Jr

Title: President